

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00068-CV

_____

IN THE INTEREST OF Z.M., W.M., AND L.M., CHILDREN

On Appeal from the 276th District Court
Marion County, Texas
Trial Court No. 14-00010

Before Morriss, C.J., Moseley and Carter*, JJ.
Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

O P I N I O N

Katy Miles and Ben Murphy have three children, five-year-old Zachary Murphy, two-year-old Wilson Murphy, and one-year-old Lucy Murphy.[1]   Miles and Murphy, both unemployed high-school dropouts, had a tumultuous, abusive relationship, lived with the children in a filthy trailer, and survived by Murphy's manufacture of methamphetamine. The parental rights of both Miles and Murphy to Zachary, Wilson, and Lucy were terminated in this case after Wilson was severely burned by chemicals, apparently in a drug-manufacturing accident.  Miles appeals by challenging the legal and factual sufficiency of the evidence and by urging error in the admission of investigator notes.

The trial court terminated Miles' parental rights to her children after a jury found that (A) she "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren]," (B) she "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]," and (C) termination of Miles' parental rights was in the children's best interests.  *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (2) (West 2014).  We affirm the trial court's judgment because we find that (1) sufficient evidence supports at least one finding of a statutory ground for termination, (2) sufficient evidence supports the finding that termination is in the children's best interests, and (3) admission of the investigator's notes was harmless.

---

[1]To protect the confidentiality of the children involved, this opinion refers to the three children and their parents by fictitious names.  *See* TEX. R. APP. P. 9.8(b)(C)(2).

2

*(1)       Sufficient Evidence Supports at Least One Finding of a Statutory Ground for Termination*

While a parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right," "the rights of natural parents are not absolute; protection of the child is paramount." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003); *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). A child's emotional and physical interests must not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the petitioner seeks to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* TEX. FAM. CODE ANN. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Thus, we strictly scrutinize termination proceedings in favor of the parent. *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick*, 685 S.W.2d at 20).

To terminate an individual's parental rights to his or her child, the Department must prove, and the trial court must find, by clear and convincing evidence, that (A) the parent has engaged in one of the statutory grounds for termination and (B) termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012); *C.H.*, 89 S.W.3d at 23. The clear-and-convincing burden of proof has been defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established," *C.H.*, 89 S.W.3d at 23

3

(quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *see* TEX. FAM. CODE ANN. § 101.007 (West 2014). Due process demands this heightened standard. *E.N.C.*, 384 S.W.3d at 802 (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). Thus, in reviewing termination findings, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *C.H.*, 89 S.W.3d at 25.

In reviewing evidence for legal sufficiency, we consider all the evidence in the light most favorable to the findings to determine whether the jury reasonably could have formed a firm belief or conviction that the grounds for termination were proven. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume that the jury resolved disputed facts in favor of the finding if a reasonable juror could do so and disregard evidence that the jury may have reasonably disbelieved the credibility of which may reasonably be doubted. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at 573.

Evidence is factually sufficient if it "is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations." *C.H.*, 89 S.W.3d at 28; *J.L.B.*, 349 S.W.3d at 846. If, in weighing disputed evidence, the jury could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient, and the termination findings must be upheld. *C.H.*, 89 S.W.3d at 18–19; *see J.F.C.*, 96 S.W.3d at 266. In applying this standard in light of the clear-and-convincing standard, we must be careful not to "'be so rigorous that the only factfindings that could withstand review are those established beyond a

4

reasonable doubt.'" *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex. App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

Miles and Murphy's tumultuous relationship was fueled by drug abuse. According to Murphy, both he and Miles had abused methamphetamine for "about three or four years." As a result of beating Miles while their oldest son, Zachary, was in the home, Murphy had previously been convicted of assault family violence. According to Department caseworker, Vickie Lynn Burns, the Department was familiar with Miles and Murphy's abusive relationship. Burns testified that, as a result of the Department's first investigation of Miles, safety measures had been put in place forbidding Murphy from being around Miles or the children.

Although Miles knew that Murphy was not supposed to be living with her and the children, they purchased a stolen, twenty-two foot, one-bedroom, one-bathroom mobile home from a carnival worker for $500.00 and resumed living as a family. For $45.00 per month, Miles and Murphy were able to park their trailer next to another trailer occupied by Miles' mother, Angela, who often supplied them with a synthetic cannabinoid drug called "K2." The Department became involved with the family a second time when Miles tested positive for methamphetamine after giving birth to Lucy. However, the Department terminated its involvement after Miles passed three drug tests, and a counselor opined she did not have a substance abuse problem.

Murphy testified that making methamphetamine was the only thing he knew how to do and that he "[h]ustled it up" to feed his family. The Department's third investigation involving Miles and Murphy began after Wilson was burned.

5

On January 22, 2014, emergency dispatcher, Sheila Jean Stokes, received a frantic call from Miles and from Angela's boyfriend, Stephen Pindergrass, asking for medical assistance because Wilson had allegedly poured drain-opening chemicals on himself and was suffering from burns. Pindergrass told Stokes that "his skin looks kind of red and his lips are kind of purple color and he keeps screaming."[2] Wilson and Miles were transported by ambulance to the Longview Regional Medical Center where it was discovered that Wilson had sustained second and third degree burns on twenty-seven percent of his body. Wilson was airlifted to Parkland Hospital in Dallas for further specialized treatment.

Dr. Matthew Cox, an employee of the University of Texas Southwestern Medical School, was asked to consult with doctors during Wilson's hospitalization. At trial, Cox described Wilson's injuries as the jury was shown horrific photographs depicting devastating burns to Wilson's face, the underside of his chin, both hands, the gaps between his fingers, thighs, and even more severe charring across his abdomen and on both legs from the knee down. Cox testified that Wilson was also injured on the front part of his mouth and tongue, indicating that his mouth was partially open when he was burned, possibly as a result of screaming in pain. Wilson was required to have skin grafts for the full thickness third degree burns, which were predominantly on his legs. He was hospitalized from January 22 to February 9, 2014, and was readmitted from February 17 until February 24 due to complications from the skin grafts. According to Cox, Wilson will have lifelong scars as a result of the incident.

---

[2]Wilson's haunting screams are heard in the background of the 9-1-1 call that was played for the jury.

Even when faced with the facts about Wilson's extensive injuries, Miles maintained that they were caused from drain-opening chemicals that were activated when Murphy attempted to wash them off. Suspecting that there was another reason why Wilson had suffered the burns, the hospital contacted the Department and the police to investigate.

The next day, David McKnight, Sheriff of Marion County, and Hershal Walker, an investigator with the Department, travelled to Miles and Murphy's trailer. McKnight testified that officers located a backpack just outside of the trailer that included items commonly used to manufacture methamphetamine, including a funnel, plastic tubing, lithium batteries, a glass dish, a bowl with white residue, coffee filters, a can of crystal Drano, and plastic containers.[3]

Hearing Zachary's voice inside the trailer, officers attempted to coax Murphy to open the door. When their efforts failed, the door was eventually forced open in spite of Murphy's attempts to push it closed. Walker testified that the trailer was covered with random clutter, that there were open containers of food on the cabinets, and that the toilet was full of feces and appeared as if it had not been flushed in more than a day. Walker also noticed several cans of Crystal Heat clog-removing crystals around the house, including one bottle that had been closed only with aluminum foil. McKnight confiscated the clog-removing crystals and proceeded to search the remainder of the trailer.

As a result of the search, police officers found a straw, a razor blade, and specks of white powder on a mirrored tray; other razor blades; small baggies; digital scales; a wooden box containing drug paraphernalia; a drug pipe; ingredients used to make methamphetamine,

---

[3]Instead of a welcome mat, the trailer displayed a mangled Care Bear suspended from a hangman's noose.

including a large quantity of salt, tinfoil, and lighter fluid; twenty-five to thirty empty packages of K2[4] that were pinned to the wall like wallpaper; a few unused packages of K2; and, under the bassinet where Lucy was sleeping, a loaded revolver and small amount of marihuana. According to Murphy, the K2 packages were pinned to the wall because "we just liked how it looked." When questioned about the loaded gun under Lucy's bassinet, Murphy explained that the gun had been on the counter, but that he hid it so it would not be found by the officers. Murphy admitted that the gun was hidden in Zachary's presence in close proximity to him. Despite his belligerent behavior and verbal threats, Murphy was arrested. Zachary watched and cried as his father was handcuffed and taken away. Meanwhile, officers were already travelling to Dallas to arrest Miles on an outstanding drug-related warrant.

McKnight was concerned about the condition of the trailer. He testified that there were live and dead roaches "[p]ractically all over the house . . . in every cabinet and every surface." A photograph of the impressive roach infestation was shown to the jury. The trailer had no running water and used an extension cord that ran to Angela's trailer for electricity. Murphy, Miles, Zachary, and Wilson all slept together on the same dirty, full-size bed without sheets. McKnight found no clean clothing, sheets, or towels in the residence. Even though there were empty food containers cluttered about, there was very little food on hand. According to McKnight, the entire trailer smelled of rotten food and feces, and the trailer looked like "filth in general." McKnight

---

[4]McKnight testified that K2 is a synthetic cannabinoid drug that has a hallucinogenic effect when smoked. Depending on its ingredients, as of 2011, K2 can be a Penalty Group 2-A controlled substance. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.1031, 481.1161 (West Supp. 2014). It is also illegal to possess a "substance that is purported to be a controlled substance, but is chemically different from the controlled substance it is purported to be." *See* TEX. HEALTH & SAFETY CODE ANN. § 482.001(4) (West 2010).

8

testified, "[W]e see a lot of bad conditions, and this is about as deplorable as I've seen between the filth and the smell."

According to Walker, Zachary and Lucy were also filthy, and Zachary's "hair was matted like it hadn't been washed in some time." Walker testified, and photographs confirmed, that Lucy was found with sores on her neck, face, and eyes and in a rather dirty condition. Zachary and Lucy were placed in the Department's care and were taken to Good Shepherd Medical Center for a medical examination. While Zachary appeared healthy, Lucy was behind on her immunizations and was diagnosed with dermatitis and conjunctivitis.

By the time of trial in this case, Murphy had been convicted of injury to a child for the injuries inflicted on Wilson and sentenced to fifteen years' imprisonment. Murphy admitted that both he and Miles had smoked K2 and were high when Wilson was injured. Murphy agreed that many of the items found by McKnight were used by Murphy to make methamphetamine and that he had decided to cook a batch on the day of the incident. Miles informed Murphy that she also wanted to use some of the methamphetamine after he finished cooking it. Yet, according to Murphy, the cooking process never actually began.

Murphy testified that he poured clog-removing crystals into a cup in preparation to make methamphetamine outside. However, he left the crystals on the kitchen counter and temporarily abandoned the project by going outside when a friend knocked on the trailer door. Murphy told the jury that he was outside when he heard Miles yelling and Wilson "screaming bloody murder" and that he rushed back inside of the trailer on hearing the commotion. According to Murphy, Wilson had white powder all over his chest and arms and under his chin and was crying because

9

the substance was burning him. Murphy said that he was not thinking clearly when he reached for a jug of water that was sitting on the counter and tried to wash the substance off of Wilson. He claimed that the water activated the clog-removing crystals, making the burns worse. He admitted that he always knew cooking methamphetamine was dangerous.

Miles, who was also incarcerated at the time of trial and facing felony charges for delivery of marihuana, told a slightly different version of the event causing Wilson's injuries. She testified that Murphy was "getting stuff ready to cook meth" outside using the Nazi-Birch "shake and bake" method when the incident happened. Unlike Murphy's version, which placed Wilson inside of the trailer when the event occurred, Miles testified that Wilson was outside with Murphy when she heard the child screaming. Miles ran outside to investigate and believed that Murphy had been injured when he tried to drink clog-removing crystals. She testified that the child was wet when she found him outside. When initially recalling the event, Miles did not mention whether Murphy poured water on the child or whether he ran back inside to retrieve water. However, after she was asked why Lucy was found with sores on her face, Miles implied that Lucy's dermatitis was also caused by clog-removing crystals by stating, "[Murphy] said he poured water all over it, all over [Wilson], and tried to wipe it off. [Murphy] must have had some still on him when he went to go touch [Lucy]."[5] Miles claimed (A) that she had believed Wilson was inside of Angela's trailer and (B) that she was unaware that Murphy was cooking methamphetamine in close proximity to the trailer.

---

[5]Murphy also provided the same explanation for the sores on Lucy's face and neck. Yet, there was no testimony that Murphy suffered any burns to his hands.

10

Cox testified that Wilson's injuries were inconsistent with the story that the child had been injured by clog-removing crystals and water for several reasons. Cox explained that (A) the crystals are not caustic and do not burn the skin until moistened, (B) the extent of the burn injury would not be possible using a crystal and water mixture unless the contact had been prolonged, and (C) the burn was not in a "running pattern that would indicate water [was] poured on him [causing] a chemical burn as it ran down his body." Instead, Cox testified that Wilson's injuries were from an alkaline or a high pH chemical agent that would be consistent with an already mixed liquid containing the crystal agents and possibly fuel. The photographs of Wilson's injuries shown to the jury supported Cox's testimony.

Murphy had initially testified that Wilson began screaming as he came into contact with the clog-removing crystals. To illustrate the fact that the crystals did not burn skin absent contact with water, the Department's counsel conducted an in-court demonstration by pouring clog-removing crystals into his hand. Nothing happened. When asked why Wilson had already been screaming before contact with water, Murphy testified, "I'm guessing his shirt was wet from when he ate dinner and got juice on his shirt, so it was already burning him." However, Cox also contested the theory that Wilson was wet before the contact with the crystals. Cox testified, "He would have to be soaking wet and would have to have an awful lot of crystals to cause that much, 27 percent of his skin being burned . . . . I can't rule it out completely, but I find that highly unlikely." According to Cox, the most likely explanation for Wilson's injury was that the plastic bottle used by Murphy to cook the methamphetamine exploded, splashed, or

11

spilled onto the child while Murphy was making methamphetamine. When pressed on this issue, Murphy stated, "I don't care to tell you the truth."

During the trial, Murphy and Miles did not appear to have much confidence in their parental decision-making. Although Murphy and Miles both testified that they did not use drugs in the children's direct presence, they admitted to using drugs while the children played outside under their care and that they understood the dangers of doing so. Both testified that their conduct was reckless and endangered the children. Miles also admitted that the children's living conditions were deplorable and that living with a methamphetamine user in a dirty, roach-infested trailer put the kids in danger.[6] She described the violence she experienced at Murphy's hands and recalled an incident where Murphy had beaten her so badly that her entire face became swollen. Miles knew Murphy was not supposed to be around her or the children, but she allowed him to live with them anyway. She also stated that she often left the children in her sister's care even though she was aware that her sister also had a drug problem. Ultimately, Miles admitted that she had not put her children's priorities first.

Court-Appointed Special Advocate Betty Allen Montgomery and Department caseworker Burns agreed with Miles' self-assessment. Burns testified that Miles admitted to using marihuana, methamphetamine, and K2 while watching the children. Burns also testified that, during the Department's investigation, Miles admitted that she was aware that Murphy was manufacturing methamphetamine outside of the trailer at the time Wilson sustained his injuries. Both Montgomery and Burns concluded that Miles allowed her children to remain in conditions

_____

[6]Miles testified that she had obsessive compulsive disorder but had stopped taking her medication.

12

or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. Montgomery and Burns testified that termination of Miles' parental rights was in the children's best interests.

The children were placed in foster care because Angela was in jail on a drug-related charge, Pindergrass was on community supervision for felony drug charges, and no other family was willing to accept the children into their home. Accordingly, Wilson was placed in a therapeutic home, and Zachary and Lucy were placed together in another foster home. Montgomery testified that both Wilson and Lucy had been withdrawn when they were removed. She also noted that Zachary had developmental speech problems and, although he was five years old, was uneducated about letters and numbers. By the time of trial, Montgomery believed that the children were thriving in foster care, that Wilson's and Lucy's demeanors were improving, and that Zachary was learning. Montgomery testified that Zachary and Lucy's foster mother was a nurse, that their foster father was a counsellor, and that the couple was interested in adopting the children. Burns added that the children had contact with each other and were doing well.

At the conclusion of the evidence, the jury entered a unanimous verdict finding (1) the subsection D and E predicate grounds for termination under Section 161.001(1) of the Texas Family Code and (2) that termination of Miles' parental rights was in the children's best interests.

Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re*

*A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769. We conclude that sufficient evidence supported the finding under ground E.

The Department alleged that Miles engaged in conduct or knowingly placed Zachary, Wilson, and Lucy with persons who engaged in conduct which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E). Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803. It means to "expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

Ground E "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.*; *E.N.C.*, 384 S.W.3d at 804–05. "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *E.N.C.*, 384 S.W.3d at 803; *N.S.G.*, 235 S.W.3d at 367). However, termination under this ground "must

14

be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.); *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367.

The jury heard about Miles' history as a victim of Murphy's ongoing domestic violence. Miles testified that Murphy would leave after abusing her, but he would always come back. When asked about the children's reactions to the physical damage and bruising that occurred during the repeated incidents of violence, Miles claimed that she decided not to explain the situation to the children because they were too young to understand. Zachary was in the home during an attack that ultimately resulted in Murphy's conviction for family violence. However, despite her knowledge of Murphy's propensity for violence and his drug use, Miles often left the children in Murphy's care. A fact-finder "can consider the history of abuse between the mother and the father for purposes of subsection[] . . . (E), even if the children are not always present." *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.) (citing *Spangler v. Tex. Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 260 (Tex. App.—Waco 1998, no pet.)).

The jury also heard about Miles' history of drug abuse. According to Murphy, Miles had been addicted to methamphetamine for the past three or four years. Miles admitted that (A) she used methamphetamine, marihuana, and K2 while the young children were in her care, (B) she was high on K2 when Wilson sustained his injuries, and (C) Wilson was hurt by chemicals that were either being used or were about to be used in the production of methamphetamine. Even

15

though Miles knew that Murphy was outside of the trailer cooking methamphetamine via the dangerous shake and bake method, Miles failed to ensure Wilson's safety—probably because she was impaired due to the effects of K2. The home was far from childproof. There was evidence that items used to make methamphetamine, including several bottles of clog-removing crystals, were strewn about the trailer, along with razor blades, a loaded gun, K2 packages, methamphetamine residue, marihuana, and other dangerous items in such a manner that they could be accessed by Zachary and Wilson.

"[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d at 843; *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child.").

Here, the evidence demonstrated that Miles' drug use led to a history of poor decision making and the future possibility that she would be incarcerated for delivery of a controlled substance.[7] In addition to leaving the children with Murphy, Miles also often left her children in the care of her sister even though she was aware of her sister's drug use. At the time of the incident involving Wilson, Miles already had an outstanding warrant for delivery of marihuana,

---

[7]We recognize that imprisonment, standing alone, does not constitute engaging in conduct which endangers the physical or emotional well-being of the child. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). However, "intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (citing *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)).

and marihuana was found under Lucy's bassinet during McKnight's search. Perhaps because of the outstanding warrant, or because she had not completed high school, had no means of transportation, and had no driver's license, Miles did not work and was financially unstable. *See In re M.N.G.*, 147 S.W.3d 521, 539–40 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (noting that parent's prolonged history of unemployment and financial instability, among other things, indicates an inability to provide for child, which is relevant consideration in trial court's finding of endangerment); *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied). As a result, although the children appeared to be sufficiently fed, they were kept in admittedly deplorable conditions. *See S.K.*, 198 S.W.3d at 906–07 (considering evidence that "the children were dirty regularly and often had lice, and that Father saw the children regularly, but took no action and left them in this condition in Mother's care" in concluding "that Mother engaged in conduct and Father knowingly placed the children with a person who engaged in conduct which endangered the physical or emotional well-being"). The jury heard evidence indicating that Zachary had developmental speech problems and had not learned about letters or numbers and that Wilson and Lucy were withdrawn, were behind on their immunizations, and had suffered physical affects from Miles' neglect.

Miles argues that there was testimony that the children were in good physical condition and were well fed. She also pointed to evidence that Zachary had not tested positive for drugs during his medical examination.[8] Murphy testified that the children did not appear to have any emotional problems. Even though the trailer had no running water and Walker testified that

---

[8]The nurses were unable to collect a specimen from Lucy for drug testing.

17

Zachary and Lucy appeared as if they had not bathed for days, Miles testified that she had recently taken the children to her sister's house to bathe. Miles testified that she loved her children and that they were bonded to each other.

In termination cases, "[w]hen there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005)). Based on all of the evidence introduced in this case, we conclude that a rational jury could readily have reached the necessary firm conviction or belief that Miles engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. Accordingly, we find the evidence both legally and factually sufficient to support the jury's finding of a statutory ground of termination.

*(2)     Sufficient Evidence Supports the Finding that Termination Is in the Children's Best Interests*

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome the presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.). In deciding whether termination would be in the best interest of the child, the trial court may consider this nonexclusive list of factors: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the

agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *K.S.*, 420 S.W.3d at 855. It is unnecessary to prove all of these factors as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27.

Also, evidence offered to prove grounds for termination, contact between the natural parent and child, degree of financial support, quality of care rendered by a child's care giver, and the caregiver's willingness to adopt are all relevant to determining if termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 28; *In re J.W.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied) ("While the prospect of adoption into a stable home cannot alone be said to be a determinative factor, it clearly is among the factors the court properly could consider."). "A parent's lack of education, training, or misfortune is considered when reviewing excuses for acts or omissions of a parent; however, these considerations do not negate evidence tending to show that termination is in the child's best interest." *Id.* (citing *In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.)).

In this case, there was no evidence of the young children's desires. However, Miles testified that the children were bonded to her and that she loved her children. We find that the first *Holley* factor weighs against termination. *See E.N.C.*, 384 S.W.3d at 808.

As a result of his injuries, Wilson required therapeutic care, including the application of lotion to his scars three times daily for the rest of his life. Although there was no evidence that the children required counseling, there was evidence that Zachary displayed developmental

19

speech and learning delays that required him to catch up. Because Lucy was found with dermatitis and conjunctivitis, she was required to be kept clean and free from a dirty environment. The jury could have found that the deplorable, roach-infested trailer would not be suitable to meet the children's needs. Due to their ages, the emotional and physical needs of the children now and in the future are great, and the evidence in this case demonstrated that Miles, who was facing the possibility of incarceration, had no income, no transportation, and no suitable home, and would not likely be able to meet the children's needs. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 9, 2012, pet. denied) (mem. op.). We find that the second *Holley* factor weighs in favor of termination.

As to the third *Holley* factor, Miles' history of victimization and her drug use while the children were in her care suggested that she might be a danger to the children if they were returned to her. From jail, Murphy wrote to Miles expressing his love for her and his intention to reunite with her. When questioned about the jailhouse letters, Miles testified that she wanted to reunite with Murphy if he was paroled as long as he was "willing to do whatever it [took] to be the person that he needs to be." Thus, if returned to Miles, it appeared that the children could once again be subjected to Murphy, one who might very well continue his endangering conduct. Accordingly, the jury could have found that Miles' history of victimization, drug addiction, history of poor choices, inability to provide a stable, clean home for her children, and possible

future incarceration presented emotional and physical dangers to the children now and in the future. The third *Holley* factor weighs in favor of termination.

"Evidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at \*7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")). The children were living in a trailer in conditions that Miles admitted were deplorable. Lucy and Wilson were behind on their immunizations, which, according to Miles, was due to lack of transportation. Miles had not paid attention to the sores on Lucy's body that were caused by dermatitis. Instead, she claimed that they must have been caused during the incident causing Wilson's injuries. It did not appear that Zachary was learning from Miles in a manner that would prepare him for kindergarten. Overall, Montgomery testified that she was concerned about Miles' parental abilities. After reviewing all of the evidence in this case, we find that the jury would be justified in having the same concern. The fourth *Holley* factor weighs in favor of termination.

As to the fifth *Holley* factor, although the Department had programs available to assist Miles to promote the best interests of the children, Miles was incarcerated and was unable to take advantage of most of them by the time of trial.[9] We find the fifth *Holley* factor neutral.

---

[9]There was evidence that Miles was writing letters to the children every week and was reading books that educated her about the effects of drugs on the body. However, there was also evidence that Miles might not have been able to take advantage of the resources available to her, possibly because of her drug use. Miles claimed that she had previously applied for government housing assistance but had been denied because she had no income and no transportation. Miles also stated that she did not independently apply for food stamps because she was living next to Angela, and Angela "was taking care of me and my kids, and she just put us on her food stamp card."

21

Miles had no plans for the children if they were returned to her. She agreed that the trailer was deplorable, but did not introduce any evidence of where she might live with the children, assuming she was released from incarceration. On the other hand, the Department introduced evidence that Zachary and Lucy's foster family provided a stable home and that the nurse foster mother and counselor foster father had plans to adopt and care for the children. The sixth and seventh *Holley* factors weigh in favor of termination.

Miles' history of victimization, drug abuse, placement of drugs and her relationship with Murphy above the needs of the children, lack of income or suitable home, neglect of the children's hygiene, and other acts indicated that Miles' existing parent-child relationship was not a proper one. Admittedly, Miles placed her needs in front of the children's needs. The eighth and ninth *Holley* factors weigh in favor of termination.

Considering the *Holley* factors, and in light of all of the evidence, the jury could have reasonably formed a firm belief or conviction that termination of Miles' parental rights was in the best interests of Zachary, Wilson, and Lucy. Therefore, we conclude that the evidence was legally and factually sufficient to support the jury's best-interest finding.

*(3)    Admission of the Investigator's Notes Was Harmless*

The Department filed its original petition January 27, 2014. Afterward, Patrick Hill, the Department's special investigator, conducted interviews with Miles and Murphy in jail February 6, 2014. Hill did not testify at trial. Instead, over Miles' hearsay objection, the Department offered Hill's notes about his interviews with Miles and Murphy and claimed that the notes were not hearsay because (A) they were business records, (B) they contained

22

statements against interest, and (C) they contained prior inconsistent statements.[10]  Miles argued

that the notes were not business records because they were prepared in anticipation of litigation,

and it was unclear whether the notes were made at or near the time of the interviews.  The trial

court overruled Miles' hearsay objection.  After the notes were read into evidence, Miles testified

that she did not remember speaking with Hill.[11]

_____

[10]Rule 803(6) of the Texas Rules of Evidence provides,

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .
>    (6)   Records of Regularly Conducted Activity.  A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  "Business" as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

TEX. R. EVID. 803(6).  The Department sought to admit Hill's notes under Rule 902(10) of the Texas Rules of Evidence, which provides,

> Any record or set of records or photographically reproduced copies of such records, which would be admissible [as a business record] under Rule 803(6) . . . shall be admissible in evidence in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of Rule 803(6) . . ., that such records attached to such affidavit were in fact so kept as required by Rule 803(6) . . ., provided further, that such record or records along with such affidavit are filed with the clerk of the court for inclusion with the papers in the cause in which the record or records are sought to be used as evidence at least fourteen days prior to the day upon which trial of said cause commences, and provided the other parties to said cause are given prompt notice by the party filing same of the filing of such record or records and affidavit, which notice shall identify the name and employer, if any, of the person making the affidavit and such records shall be made available to the counsel for other parties to the action or litigation for inspection and copying.

TEX. R. EVID. 902(10).  Hill did not sign the business records affidavit.  The business records affidavit, executed by Kristala Evans, the Department's custodian of records, attached 357 pages of records, including Hill's notes.

[11] Hill's notes about Miles' interview contained the following bullet points:
  • I read Dr. Cox's assessment to [Angela], pointing out the discrepancies between his assessment and her and [Murphy]'s account of the incident.
  • Specifically, I pointed out Dr. Cox's assertion that "drain clearing crystals" do not cause burns without introducing a liquid.

23

Even assuming Hill's notes were inadmissible hearsay, any error in their admission was harmless. To be entitled to reversal due to the erroneous admission of evidence, an appellant must show that the error probably resulted in an improper judgment. TEX. R. APP. P. 44.1(a); *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). In making this determination, we review the entire record. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870.

- I pointed out that the absence of burns in [Wilson]'s throat and esophagus, where indicative of an inaccurate account that he was attempting to "drink" the drain clearing crystals.
- Further, I pointed out that the burns on [Wilson]'s skin had to be caused by something other than drain clearing crystals alone.
- I asserted that Dr. Cox's assessment indicated that the injuries were acquired during an incident where drugs were being produced.
- I went as far as to say that the methamphetamine manufacturing was suspected.
- I reminded [Miles] that she admitted to me that [Murphy] was in fact "cooking meth" that evening and borrowed ingredients from her.
- She however had previously claimed that [Murphy] did not "cook the meth" at or near her trailer, but instead, somewhere else in the vicinity of the trailer park . . . .
- She replied, "It is for shake and bake." I asked her if she understood what I was implying.
- She responded, "Well, I'm not gonna protect him anymore? He's just a scary person. He's not a good person."
- I asked her to tell me what happened.
- She indicated that [Murphy] was cooking the methamphetamine "Outside? Over there towards where his dogs are. [Murphy] had a little pallet or whatever set up where the dog is, the first dog, the black and white one, close to the brown one. [Miles] said, 'You know people are watching you" and [Murphy] said, "It will be alright, ain't nothing gonna happen to me? [Miles] said, "Well I ain't gonna be out there when you do it."
- She indicated that she made excuses for [Murphy] for everything, including her own injuries received from him during domestic violence incidents . . . .
- Regarding the incident, she stated, "I guess he [Wilson] went outside to play or something."
- She said, "He was out there for like 30 minutes and I heard screaming. [Murphy] did nothing. I guess he tried to wipe it off of him. All I could do was pick him up and go call 911."
- She continued, "[Murphy] left from there. He got all his stuff and left. . . ."
- She stated that [Murphy] just gathered all his cooking implements, put them in his bag and left.
- I asked what he did with what he had cooked.
- She stated, "He just had what he had started in the bottle. I guess the Drano that he had was in a cup and that's how it went up him."
- She confirmed that she knew that [Murphy] was cooking methamphetamine on their property.
- She stated that she said to [Murphy], "What happened to my baby?"
- [Murphy] stated, . . . "The stupid mother-fucker got into my shit!"
- After that, she grabbed [Wilson] and ran with him next door.
- I informed her that despite her honesty, she would not be completely out of the woods because she had knowledge of the incident and lied about it.

24

The admission of the challenged evidence is harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id.*; *see also In re K.R.*, 63 S.W.3d 796, 800–01 (Tex. 2001).

Here, according to Miles, the most damaging portion of Hill's notes was the alleged recording of Miles' statement that she was aware that Murphy was manufacturing methamphetamine at the time of the incident. At trial, Miles testified she knew that Murphy cooked methamphetamine. During Miles' cross-examination, the Department asked her whether she had told a Department investigator that "[Murphy] was cooking methamphetamine [outside] where his dogs [were]" at the time of the incident, and Miles replied, "Yes, that's where I figured he would be at." Without objection, Burns also testified that Miles had admitted her awareness that Murphy was manufacturing methamphetamine outside of the trailer at the time Wilson sustained his injuries.

We find that admission of Hill's notes was harmless because (1) the most damaging portions of the notes were cumulative of other testimony and (2) even absent Hill's notes, the evidence was both legally and factually sufficient to support the jury's verdict. Accordingly, we overrule Miles' last point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:    December 5, 2014
Date Decided:    January 23, 2015