

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00218-CV

———————————————————

IN THE INTEREST OF U.L., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-680224-20

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant U.L. (Father) appeals the trial court's order terminating his parental rights to his child U.L. (Uriah).[1] In two issues, Father contends the evidence was insufficient to support termination under Family Code Section 161.001(b)(1)(D) and (E). Because we will hold that the evidence was legally and factually sufficient to support the conduct grounds, we will affirm the trial court's termination order.

## II. BACKGROUND

M.W. (Mother) gave birth to Uriah in April 2020.[2] Both Uriah and Mother tested positive for cocaine at his birth, and later that month, the Department of Family and Protective Services (the Department) sought and obtained an order naming it as Uriah's temporary sole managing conservator. Uriah was then placed with a foster family.

Father was on notice in April 2020 that he might be Uriah's father, and paternity was confirmed by a DNA test in July 2020. Although the DNA test confirmed his paternity, Father admitted to "having some mental health issues" at the time and did not believe that Uriah was his child. According to Father, he

---

[1] We use aliases to refer to the child and the parties. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] The trial court terminated Mother's parental rights to Uriah in the same order terminating Father's parental rights. Mother does not appeal.

acknowledged paternity later in 2020 when he "stopped doing so many drugs and [his] mind was coming back."

Father has a history of mental-health problems. When he was thirteen or fourteen, he was diagnosed with bipolar and schizoaffective disorder. Father testified that he had been receiving mental health services "on and off" ever since. Father's mental-health problems continued after Uriah's birth. Father testified that he had received mental-health treatment at hospitals "quite a few times" since Uriah's birth. He stated that he had been placed in the hospitals because he "was thinking people were trying to kill [him] and following [him], and [he would] leave the house and . . . go and sleep on the trains and end up in the hospital." Father also testified that he had believed that "CPS" or "the cartel" was trying to kill him whenever he "went to the CPS department."[3] Father stated that he was given prescriptions by the hospitals for mental-health treatment but that he had stopped taking the prescribed medications around the fall of 2020. When asked why he had stopped, Father stated, "I was undergoing, like, you know, acute psychosis. I was in the grip of that and I don't know. I was on drugs at the time as well, so . . . ."

Father also has a history of illegal drug use that exacerbates his mental-health problems. Father testified that he started using marijuana when he was eight or nine

---

[3]Father testified that he began to be less paranoid about being killed by "CPS" or "the cartel" when he "just didn't care anymore." He stated, "I was like whatever. What's going to happen, is going to happen."

3

and that his usage was "[a]ll day, every day[,] [a]s much as [he] could consume."[4]  He said that he first experimented with cocaine in the 1980s but that he "stuck with it in 2006."  He described his cocaine usage as "$20 a night for years and years . . . but if [he was] with a female that does a lot of drugs, [he would] end up doing a lot more."  Father testified that he had started using methamphetamines when he was "in [his] 40's."[5]  He also stated that his longest stretch of sobriety was seven years.  Father testified that he experienced side effects from taking illegal drugs, including paranoia, insomnia, and hallucinations.

Father's illegal drug use continued after Uriah's birth.  Father testified that in October 2020, he was taken to a hospital because "somebody gave [him] some K2 and [he] almost died . . . ."[6]  Father stated that he thought that someone was trying to poison him and that this incident was "part of the plot" to kill him.  Father also testified that he had broken his ankle in July 2020, and he had obtained pain

---

[4]Father was fifty-four years old when Uriah was born, and Father was fifty-six years old at the time of trial.

[5]As for his use of methamphetamines, Father's testimony was unclear.  He testified that he had been using it "[n]ot long.  Probably four or five months, six months.  I mean, if you put it all—I might've used it every day for years, but I've never used a lot.  I've always—I've never did a lot of drugs."

[6]K2 is a synthetic marijuana or a synthetic cannabinoid.  *See In re E.M.*, 494 S.W.3d 209, 223 n.2 (Tex. App.—Waco 2015, pet. denied) ("K2 is a commonly used name for synthetic marijuana, a controlled substance that is unlawful to possess."); *In re Z.M.*, 456 S.W.3d 677, 682 n.4 (Tex. App.—Texarkana 2015, no pet.) ("K2 is a synthetic cannabinoid drug that has a hallucinogenic effect when smoked.").

4

medications "off the street" without a prescription. When asked what pain medications he had obtained "off the street," Father said, "[A]nything I could get, really." Father was later asked why he did not receive pain medications prescribed by a physician, and Father explained that "at the time [he] was having psychological problems, and [he] was thinking the doctors were trying to do something to [him]."

In November 2020, Leigh Ann Flores, a permanency specialist contracted by the Department, spoke with Father about his drug use. Father admitted to Flores that he had used cocaine that month and that when he used cocaine, "meth must be in the cocaine." During that conversation, Father also told Flores that he was using marijuana but that he was trying to stop. At trial, Flores described a supervised visit she had with Father and Uriah in November 2020, where Father was on the floor with Uriah, and Father told her that he had forgotten that he had an OxyContin pill in his pocket and that he was going to take it.[7] Father told Flores that he did not have a prescription for the pill but that he had "got if off the streets."[8] Flores also testified that Father had tested positive for methamphetamines in October or November 2020. She also testified that Father had tested positive for marijuana in December 2020.[9]

---

[7]Flores requested that Father not take the pill, and Father complied.

[8]During his testimony at trial, Father said that Flores's testimony regarding the pill was a "complete fabrication."

[9]During a visit with Flores in December 2020, Father told her that his December 2020 drug test was negative, but Flores had to remind him that the test was

5

Father testified that he had stopped using marijuana, methamphetamines, and cocaine sometime around the December 2020 test result.

One possible explanation for why Father was able to stop his use of illegal drugs after the December 2020 test result was that he was arrested in January 2021 and spent the next six months incarcerated.[10] Father is no stranger to the criminal justice system. At trial, Father admitted that he had over ten convictions in California, including a conviction for inflicting corporal injury on a spouse or cohabitant and two convictions for willful cruelty to a child causing injury. Father explained at trial that the conviction for inflicting corporal injury on a spouse or cohabitant and the convictions for willful cruelty to a child causing injury stemmed from the same incident. Father stated that during that incident, he got into an argument with the mother of one of his children who had a child in her vehicle. Father testified that the woman accused him of having sex with his sister and kicked him. He then "tried to pull her out of the car" and "tr[ied] to tear her head off because she [had] kicked [him]."[11] Father explained that during the argument with the woman, he took the

---

positive for marijuana. Father then admitted to Flores that he was still using marijuana.

[10]The record reflects that Father was placed in a mental-health unit during at least part of his incarceration. Father admitted at trial that he "was kind of off [his] rockers" when he began his incarceration.

[11]When Flores asked Father about this incident, Father told her that the woman "kicked him so he pulled the car over and took the bitch out of the car and wanted to kick her face in."

child out of the vehicle and set the child down "15 feet" from the woman. Father averred that "[t]here was no injury to the child."[12]

Father's criminal activities continued after Uriah's birth, leading to his arrest and incarceration in January 2021. In this regard, Father was convicted of the following offenses that occurred after Uriah's birth: (1) theft of less than $2,500 with two or more previous theft offenses for stealing "clothing items, pens, a cable, headphones, a stereo, and a drink" on July 13, 2020; (2) theft of less than $2,500 with two or more previous theft offenses for stealing "a computer, clothing, and health and beauty products" on July 23, 2020; and (3) theft of less than $2,500 with two or more previous theft offenses for stealing "clothing, electronics, light bulbs[,] and infant products" on September 24, 2020.

Flores testified that she set up a service plan for Father and gave it to him around October 2020.[13] Flores also testified that Father had not substantially complied with his service plan. She testified that Father's service plan required that he receive drug treatment but that Father had told her during their most recent visit that he was "not going to do any drug treatment" and that "he does not care what anybody says, including the Court." Father testified that he did not believe that he

---

[12]Father testified that he was incarcerated for "almost three years" as a result of this incident.

[13]Father testified that he first saw the service plan in January 2021, when he was incarcerated. Father also admitted that "[a] lot of times [he] would forget completely about the services plan" because of his mental-health issues.

needed to follow "somebody's system" regarding drug treatment but that he could and had quit using illegal drugs by following his own "system." Flores also testified that Father was asked to participate in individual counseling and that while he had started counseling, he did not complete it. Father testified that he did not need counseling. Father explained that he did not require any assistance with coping skills because he had been coping and that "[i]f you're in the grips of psychosis, you hearing voices and seeing things and believing things, the coping was just to deal with it and go day by day without trying to hurt nobody and running up on people. So that's the coping right there." At trial, Father testified that he had stopped using illegal drugs, that he planned to stay on his current mental-health medications, and that he was not experiencing any symptoms of his bipolar and schizoaffective disorder.

Following the July 2021 termination hearing—which took place one month after Father's incarceration ended—the trial court issued a ruling terminating Father's parental rights to Uriah under Subsections (D) and (E) of Family Code Section 161.001(b)(1) and finding that such termination was in Uriah's best interest. Father appeals from that termination order.

### III. DISCUSSION

In two issues, Father argues that the evidence was insufficient to support termination under Family Code Section 161.001(b)(1)(D) and (E).

## A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings—here the endangerment findings under Family Code Section 161.001(b)(1)(D) and (E)—to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary

9

evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the endangerment grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Law on Endangerment

Subsections (D) and (E) of Family Code Section 161.001(b)(1) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that a parent has

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

10

(E)  engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection 161.001(b)(1)(D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* As an example, "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* Illegal drug use by the parent and drug-related criminal activity by the parent "likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id.*

Under Subsection 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not

11

necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.*

Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being. *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied); *R.W.*, 129 S.W.3d at 739. "Untreated mental illness can expose a child to endangerment . . . and is a factor the court may consider" in its endangerment analysis. *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Indeed, "[m]ental health issues that are frequently untreated, especially when combined with delusions, hallucinations, a diagnosis of paranoid schizophrenia, and an unwillingness or inability to appreciate the consequences of failing to treat those issues, can present a substantial risk to a child's safety." *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *14 (Tex. App.—Fort Worth May 29, 2014, no pet.) (per curiam) (mem. op.).

Illegal drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *R.W.*, 129 S.W.3d at 739. Criminal activity that exposes a parent to incarceration may also endanger a child. *In re I.L.*,

No. 02-18-00206-CV, 2018 WL 5668813, at \*5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at \*2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.). "Domestic violence, want of self[-]control, and propensity for violence may [also] be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

We may consider conduct that occurred outside the child's presence in our review. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We may also look at parental conduct both before and after the child's birth to determine whether termination is necessary. *R.W.*, 129 S.W.3d at 738; *J.T.G.*, 121 S.W.3d at 125. Further, a father's conduct before paternity is established may be considered as evidence of an endangering course of conduct. *R.W.*, 129 S.W.3d at 738.

## C. Endangerment Analysis

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review. *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at \*10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

Here, the record reflects that Father's mental-health issues, illegal drug use, and criminal activity have been a persistent problem in his life and that these issues have continued past Uriah's birth. As to his mental-health issues, the record reflects that

13

Father was diagnosed with bipolar and schizoaffective disorder in his youth and that he has been receiving mental health services "on and off" for over forty years. The record further reflects that after Uriah's birth, Father received mental-health treatment "quite a few times" because he thought that people were trying to kill him. These thoughts caused him to leave his home and to sleep on trains, eventually winding up in the hospital. The record also reflects that for a period after Uriah's birth, Father stopped taking his prescribed mental-health medications. Finally, the record reflects that Father's mental-health issues are exacerbated by his illegal drug use.

As to his illegal drug use, the record reflects that Father has used marijuana since he was eight or nine, and he described his usage as "[a]ll day, every day[,] [a]s much as [he] could consume." The record further reflects that Father has been a long-time user of cocaine and that he also has a history of methamphetamine use. Since Uriah's birth, Father has tested positive for methamphetamines and marijuana, and he has admitted to using cocaine, methamphetamines, and marijuana during that time. Additionally, since Uriah's birth, Father has been hospitalized due to his use of K2, a synthetic marijuana, and he has taken pain medications that he obtained "off the streets." The record also reflects that during a supervised visit with Uriah, Father had an unprescribed OxyContin pill in his pocket when he was playing on the floor with Uriah. Finally, the record reflects that Father did not receive the required drug treatment under his service plan and that he did not believe that he needed to follow

"somebody's system" regarding drug treatment but that he could quit using illegal drugs by following his own "system."

As to his criminal activity, the record reflects that Father has over ten criminal convictions in California, including a conviction for inflicting corporal injury on a spouse or cohabitant and two convictions for willful cruelty to a child causing injury. The record further reflects that Father has continued to engage in criminal activity following Uriah's birth. Apart from his use of illegal drugs following Uriah's birth, Father has also been convicted of three theft offenses during that time and was incarcerated for six months due to those convictions.

In his brief, Father argues that the termination trial focused too much on his past behavior and that the record reflects that he "took advantage of his second chance while [Uriah] was in foster care." We disagree. While the record does contain much evidence of Father's mental-health issues, illegal drug use, and criminal activities before Uriah's birth, as detailed above, the record further reflects Father's mental-health issues since Uriah's birth, Father's illegal drug use since Uriah's birth, and Father's engaging in criminal activities since Uriah's birth. Moreover, in our review, we may consider parental conduct before a child's birth. *See R.W.*, 129 S.W.3d at 738; *J.T.G.*, 121 S.W.3d at 125.

Finally, Father seems to emphasize that many of his issues had subsided by the time of the July 2021 trial and that he was working on his issues by following his "system." But Father fails to take into account—as the factfinder reasonably could

15

have—that Father had been incarcerated between January 2021 and June 2021 and that the success of Father's "system" could have been simply due to the fact that Father was incarcerated during much of that time. Moreover, "even if a parent makes dramatic improvements before trial, 'evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.'" *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g) (quoting *J.O.A.*, 283 S.W.3d at 346).

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Father had knowingly placed or had knowingly allowed Uriah to remain in conditions or surroundings that had endangered Uriah's emotional or physical well-being and that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct that had endangered Uriah's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had knowingly placed or had knowingly

16

allowed Uriah to remain in conditions or surroundings that had endangered Uriah's emotional or physical well-being and that Father had engaged in conduct that had endangered Uriah's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re M.A.P.*, No. 02-11-00484-CV, 2012 WL 2036457, at *8–10 (Tex. App.—Fort Worth June 7, 2012, no pet.) (mem. op.) (finding evidence sufficient to support endangerment when mother used marijuana during the pendency of the Department's case despite knowing that it exacerbated her schizophrenia, used marijuana around infant, and failed to take her mental-health medications); *J.I.T.P.*, 99 S.W.3d at 845 (considering mother's mental state, her history of noncompliance with her medications, and domestic violence as factors endangering the child's well-being); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (finding evidence sufficient to support endangerment when mother was on medication for paranoid schizophrenia at the time of trial, had been violent in the past because of her mental-health issues, had been hospitalized over twenty times, and had destroyed property and attempted to steal a helicopter).

We overrule Father's two issues.

## IV. CONCLUSION

Having overruled Father's two issues, we affirm the trial court's termination order.

17

/s/ Dana Womack

Dana Womack
Justice

Delivered:  November 10, 2021