

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-17-00068-CV

---

IN THE INTEREST OF K.D., C.D., AND C.F., III, CHILDREN

On Appeal from the 115th District Court
Marion County, Texas
Trial Court No. 16-00038

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

After establishing a long-standing pattern of bad choices and drug and physical abuse, Mother[1] had her parental rights to K.D., C.D., and C.F., III, terminated in a jury trial in Marion County.[2] In this accelerated appeal, Mother argues that the evidence was factually insufficient to support termination on grounds D, E, N, and O under the Texas Family Code and that the evidence was legally and factually insufficient on grounds M and P. *See* TEX. FAM. CODE. ANN. § 161.001(b)(1)(D), (E), (M), (N), (O), (P) (West Supp. 2017). She also complains that the evidence was legally and factually insufficient to support the jury's finding that termination of her parental rights was in the children's best interests and that, because the jury charge failed (a) to include an independent finding that termination was in the children's best interests and (b) to require the jury to identify the ground(s) on which termination was based, the jury charge was legally defective. Consequently, Mother claims that she was denied due process of law.

We affirm the trial court's order because (1) sufficient evidence supports at least one predicate ground for termination, (2) sufficient evidence supports the best-interest finding, and (3) Mother's complaint regarding jury charge error was not preserved for review.

---

[1]We refer to the children and their fathers by their initials and to the mother as "Mother" in order to protect the identity of the minor children who are the subject of this appeal. *See* TEX. R. APP. P. 9.8.

[2]Suit had been brought by the Texas Department of Family and Protective Services (the Department).

*(1)     Sufficient Evidence Supports at Least One Predicate Ground for Termination*

Mother's relationship with C.F., Jr., her more recent husband and the father of one of the children involved here, was marred by domestic violence.[3]   As a result, Mother filed assault charges against C.F., Jr., in mid-2015, but ultimately dropped those charges when C.F., Jr., who was on parole, agreed to counseling.  In October 2015, C.F., Jr., choked Mother while he was holding C.D.  Mother asked her daughter, K.D., to call 9-1-1 on that occasion.  In December 2015, C.F., Jr., punched Mother in the face "a couple of times."  Although the children were outside in the truck during this incident, K.D. again called 9-1-1 to report the assault.

Sometime thereafter C.F., Jr., was jailed—for the reported incidents of domestic violence—and was released in February 2016.  On his release from jail, C.F., Jr., returned to the family home with Mother, K.D., C.D., and C.F., III.  In June 2016, after the children were in the Department's custody, Mother and C.F., Jr., "punched each other a few times" during a counseling session.[4]   Although Mother acknowledged that her children would be emotionally disturbed by being in the presence of abusive conduct, Mother was not willing to give up on her marriage.

C.F., Jr., also used drugs and had a history of criminal convictions.  In the summer of 2016, C.F., Jr., tested positive for methamphetamine.  During this same time frame, C.F., Jr., was involved in a theft scheme.  When Mother discovered C.F., Jr.'s, involvement in the theft scheme and confronted him about it, C.F., Jr., became angry and hit Mother, breaking her nose and causing

---

[3]C.T. is the father of C.D. and K.D.  Mother lived with C.T. for approximately four years, but the two did not marry. That relationship was likewise marred by domestic violence.  After her relationship ended with C.T. in 2011, Mother married C.F., Jr., in 2015. C.F., Jr., is the father of C.F., III.  The parental rights of C.T. and C.F., Jr., were likewise terminated.  This appeal, however, deals solely with the termination of Mother's parental rights.

[4]Mother testified that she was angry at C.F., Jr., because she found pornography on his cell phone.

3

an orbital fracture. As a result of this incident, C.F., Jr., was again jailed and was released in September 2016.[5] The evidence showed that C.F., Jr., had a long-term methamphetamine addiction, dating back to the age of sixteen. Mother left the children in the care of C.F., Jr., when she was working.

The Department initially made contact with Mother in December 2015, after reports of domestic violence in the home. After the Department investigator determined that C.F., Jr., was in jail, it took no further action. In January 2016, the Department was contacted with a report of Mother's physical abuse of her elderly father and a second report that Mother took C.F., III, to the emergency room because he had possibly swallowed four Alprazolam.[6] There were concerns at that time that Mother was using methamphetamine because she had sores all over her body. When the Department investigator contacted Mother, Mother refused drug testing. In February 2016, Mother told a Department investigator that C.F., Jr., was in jail for domestic violence, but she intended to reunite with him. Mother also indicated that she had gotten into an altercation with her sister-in-law and was injured as a result.[7]

---

[5]C.F., Jr., was twice convicted for assault family violence involving Mother. C.F., Jr., was also convicted of theft in 2009, manufacture and delivery of a controlled substance in 2004, possession of marihuana in 2003, burglary of a vehicle at some unknown time, and burglary of a building in 2001.

[6]It was ultimately determined that C.F., III, did not ingest Alprazolam.

[7]Mother threatened the Department caseworker assigned to her case, telling her, "[Y]ou're going to get you're a** beat."

4

A few days later, Mother contacted the Department to advise that she had moved to Tyler, that she was going to turn herself in on a warrant for her arrest for abuse of her elderly father, and that the children would be with Shelacy Hebert.[8]

On March 11, 2016, the Department received the results of Mother's drug test, indicating positive results for marihuana and methamphetamine. Mother admitted during counseling that, in addition to marihuana and methamphetamine, she had used cocaine in the past. On March 16, 2016, the children were removed from the home.[9] After the removal, drug tests were performed on the children. C.F., III, tested positive for methamphetamine, amphetamine, cocaine, and marihuana. The evidence indicates that one of the other two children tested positive as well, although the record is not clear regarding which child, in addition to C.F., III, was exposed.

Shortly thereafter, the trial court issued a temporary order requiring Mother, among other things, to perform certain tasks in order to regain possession of her children. The temporary order required Mother to complete a psychological evaluation and drug and alcohol assessment, submit to drug testing as requested,[10] complete a parenting course, and participate in counseling, to include domestic violence counseling and anger management.

---

[8]The children were ultimately placed with Sherri Bowser as Hebert had a criminal record.

[9]On March 16, 2016, the trial court issued an order for protection of a child in an emergency. The trial court found that the children were removed from the home pursuant to Section 262.104 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 262.104 (West Supp. 2017). In support of this order, the trial court found, among other things, that "[t]here is a continuing danger to the physical health or safety of the children if the children are returned to the parent . . . ." The order named the Department as the temporary sole managing conservator of the children. Also on March 16, 2016, the Department filed its original petition for protection of a child, for conservatorship, and for termination of parental rights of Mother, C.T., and C.F., Jr.

[10]Mother was asked to submit to eleven drug tests, but failed to submit to five of those.

5

Mother underwent a psychological evaluation and substance abuse assessment. The psychological evaluation indicated that Mother presented with a personality disorder, major depressive disorder, and post-traumatic stress. Mother was prescribed medications for some of her diagnoses, but she does not take the prescribed medications.

As a result of the psychological evaluation, Mother was ordered to attend counseling. At that time, she was living in Magnolia, Arkansas, and counseled with Pastor Ron Owens. Mother completed an anger management course but was ordered to take the course again, after she and her husband engaged in a physical confrontation during a counseling session.[11] As a result of the substance abuse assessment, Mother was to receive outpatient drug treatment. Although she did not receive such treatment, Mother testified that she attended Celebrate Recovery in Magnolia, although she did not provide any documentation of her attendance.[12] Mother was also ordered to pay child support in the amount of $200.00 per month beginning July 1, 2016. Mother has failed to make any child support payments.

The last time Mother visited with her children was in September 2016. Mother's visitation was terminated by court order in October 2016 after she moved to Magnolia.

Before the commencement of this case, Mother's parental rights were terminated with respect to her first child, T.D.M., in Arkansas. Mother admitted that she did not complete her

---

[11]Mother testified that she was told that she could complete anger management counseling with Owens, although the Department denies this and contends that such counseling was not completed. Owens testified that he is not a licensed professional counselor, and he did not counsel her on anger management.

[12]The Department ultimately recommended that Mother attend the Kirkpatrick Treatment Center, a residential facility, where Mother could receive all of the services she was required to complete. Mother did not agree to attend Kirkpatrick.

services in the Arkansas case and that she had a drug problem at that time. Mother testified that she no longer has a drug problem.[13] Hebert, a long-time friend of Mother's, testified that Mother has used methamphetamine. Between 2009 and 2014, Mother has been involved in fourteen Department interventions.

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, the custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2017); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). Clear and convincing evidence is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of

---

[13]Prior to the removal of her children, however, Mother tested positive for methamphetamine and marihuana in March 2016. On six subsequent occasions, she tested positive for marihuana. Mother testified that she had not continually been smoking marihuana, but that she had smoked marihuana once on the day she moved to Arkansas.

the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or whose credibility could reasonably be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* at 28. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *Id.* at 18–19. In applying this standard in light of the "clear and convincing" language required by Section 161.001 of the Texas Family Code, we must be careful not to "be so rigorous that the only fact[-]findings that could withstand review are those established beyond a reasonable doubt." *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex.

App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994) (citation omitted)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

Mother complains that the evidence is (1) factually insufficient to support termination under grounds D, E, N, and O of the Texas Family Code and (2) that the evidence was legally and factually insufficient under grounds M and P of the Texas Family Code. *See* TEX. FAM. CODE. ANN. § 161.001(b)(1)(D), (E), (M), (N), (O), (P).

"Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.) (citing *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.)). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)).

The trial court found that Mother engaged in conduct or knowingly placed K.D., C.D., and C.F., III, with persons who engaged in conduct which endangered the children's physical or

9

emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (ground E). Under ground E, the term endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Moreover, termination under ground E requires more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent" must be established. *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.).

The jury heard about Mother's history as a victim of C.F., Jr.'s, ongoing domestic violence. Although C.F., Jr., was twice incarcerated for assaulting Mother, Mother continued to reunite with him. And, notwithstanding the extreme nature of C.F., Jr.'s, abuse, Mother continued to subject herself to that abuse and exposed K.D., C.D., and C.F., III, to the physical and emotional dangers that accompanied contact with C.F., Jr. In fact, K.D. called 9-1-1 on two different occasions involving domestic violence in the family home.

Not only was she aware of the fact that C.F., Jr., exhibited extreme violence, Mother acknowledged that her children would be emotionally disturbed by being in the presence of abusive conduct. William Grant, a licensed counselor with the Department, testified that children who are exposed to domestic violence become fearful, develop anger and a lack of trust, become disrespectful, and may even become violent. The fact-finder was entitled to consider this history of domestic violence between Mother and C.F., Jr., to determine whether ground E was satisfied. *See In re L.E.S.*, 471 S.W.3d 915, 923–24 (Tex. App.—Texarkana 2015, no pet.); *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.).

10

The evidence further revealed that Mother and C.F., Jr., have both exhibited a pattern of drug use. Mother tested positive for marihuana and methamphetamine in March 2016 and tested positive for marihuana on six occasions during the pendency of this case. Mother also admitted to having used cocaine. The evidence established that C.F., Jr., had a history of methamphetamine addiction, dating back to the age of sixteen, and that Mother left the children in the care of C.F. Jr., when she was working. Drug testing on the children revealed the C.F., III, tested positive for exposure to methamphetamine, amphetamine, cocaine, and marihuana, and that at least one of the other children tested positive as well.

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Because illegal drug use may result in parental impairment or imprisonment, it may be used to support termination under ground E. *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Indeed, the effect of drug use on a parent's life and "ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *In re N.S.G.*, 235 S.W.3d 358, 267–68 (Tex. App.—Texarkana 2007, no pet.)); *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (parent's illegal drug use often cited as conduct that will support affirmative finding under ground E).

Here, the record is replete with evidence of long-standing domestic violence in the family home as well as Mother's illegal drug use, C.F., Jr.'s, illegal drug use, and at least two of the children's exposure to measurable amounts of illegal drugs. We, therefore, must affirm the trial

11

court's order terminating Mother's parental rights to K.D., C.D., and C.F., III, pursuant to Section 161.001(b)(1)(E).  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).[14]

*(2)    Sufficient Evidence Supports the Best-Interest Finding*

To uphold the termination finding, we must determine whether the Department proved, by clear and convincing evidence, that termination of Mother's parental rights was in the children's best interests.  *See* TEX. FAM. CODE ANN. § 161.001.  There is a strong presumption that a child's interest is best served by preserving conservatorship in the natural parent. That presumption can be overcome, however, with clear and convincing evidence to the contrary.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

A number of considerations, known as the *Holley*[15] factors, can influence a determination of the best interest of the child, including

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley*, 544 S.W.2d at 371–72).  This list is not exclusive, and there is no requirement that any unique set of factors be proved.  *Id.*  Certainly, it is not necessary to prove all nine factors.  *C.H.*, 89 S.W.3d at 27.  The analysis of evidence relating to one factor may be adequate in a particular situation to support a

---

[14]Although the trial court terminated Mother's parental rights under grounds D, M, N, O, and P as well, we need not address these grounds as the evidence is factually sufficient to support termination under ground E.

[15]*See Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976).

finding that termination is in the best interest of the child. *Swate v. State*, 72 S.W.3d 763, 767 (Tex. App.—Waco 2002, pet. denied). Additionally, evidence supporting the termination of parental rights is also probative of best interest. *C.H.*, 89 S.W.3d at 28.

At the time of trial, K.D. was eight years old, C.D. was seven, and C.F., III, was two. Although K.D. and C.D. were certainly old enough to express their desires, they were not asked what those desires were. Due to his young age, C.F., III's, desire cannot be determined.

Karen Corpier, a court-appointed special advocate for the children, testified that, when she visited the children approximately one week before trial, the children did not ask about Mother or mention her. Corpier did not ask the children what their desires were at that time, although K.D. indicated at the beginning of the case that she wanted to live with Mother. Accordingly, the first *Holley* factor is neutral with respect to C.D. and C.F., III, but weighs in favor of Mother with respect to K.D.

Several factors weigh against Mother's desire to maintain her parental relationship with the children. Foremost among these factors are the children's present and future physical and emotional needs, Mother's ability to provide a safe and stable home for the children, and Mother's acts and omissions which suggest that her existing relationship with the children is not a proper one. Although Mother testified that she is not currently using illegal drugs and that she plans on divorcing C.F., Jr., the totality of Mother's past decisions, including her drug use, her continual return to C.F., Jr., who was violently abusive, the failure to seek and maintain employment during the pendency of the case, the lack of a home for her children, and her refusal to take prescribed

13

medications for manic depression, bipolar disorder, major anxiety disorder, and personality disorder all fatally erode Mother's ability to maintain her parental relationship with the children.

When the children were removed from the home, the evidence shows that the home was in disarray and was not a healthy environment for the children. Mother was wearing shorts and a sleeveless top and had red pox marks all over her body. Testimony at trial indicated that those marks are consistent with someone who has been cooking methamphetamine.[16] Further testimony revealed that Mother does not accept responsibility for her mistakes and that Mother is not capable of putting her children's needs above her own. A second witness testified that, in her opinion, Mother is not capable of providing a stable environment and a safe home for her children and that she is not capable of putting her children's needs above her own.

Owens, who counseled with Mother, testified that, in his opinion, she was "not in a place to be parenting children." Deanne Goldman, who helped raise Mother and helped her after she moved to Magnolia, described Mother as "a con artist . . . [who] was doing everything she could to manipulate everybody that was trying to help her." In Goldman's opinion, Mother is not capable of providing a safe and stable environment for the children.

Sherri Bowser, with whom the children resided from March 2016 until early September 2016, testified that she did not receive any financial support from Mother to help care for the children. At one point, Mother became verbally abusive of Bowser after Bowser indicated that she could no longer afford to care for the children. Mother cursed at Bowser in front of the

---

[16]Mother explained that the red marks were due to psoriasis. The witness who opined that the marks were consistent with a person who had been cooking methamphetamine was not a medical doctor.

children, and the children were very upset by the outburst. Mother promised the children on more than one occasion that they would be back home with her, after which the children would mark their calendars, and nothing happened. This caused the children to experience "very bad mood swings." Consequently, it was Bower's opinion that Mother is not capable of providing a safe and stable environment for the children.

Grant, who provided domestic violence and parental counseling to Mother and C.F., Jr., concluded that Mother refused to take responsibility for anything in her life and that he did not believe that she could benefit from counseling. Grant testified that he never saw any indication that Mother would be able to put her children's needs first or that she would be able to provide a safe and stable environment for her children.[17]

Vicki Burns, the Department caseworker assigned to this matter, also testified that the children are better able to receive the care and stability they need, free from drugs and violence, in their current placement. The children have been in foster homes since September 2016. The two oldest children, K.D. and C.D., are in the same foster home, while C.F., III, is in a different foster home. Although the children are not living together, K.D. and C.D. often spend the weekend with C.F., III, and they are able to visit him during the week. The foster families are making sure that the children are able to see each other regularly. K.D. and C.D. are both taking Tae Kwon Do, C.D. is playing basketball, and K.D. is a cheerleader. C.F., III, is learning his ABC's, is talking in full sentences, and knows his colors. The children are all healthy and are doing well in school.

---

[17]During the course of the proceedings, Mother lived in seven different residences. Mother initially lived with her brother in Tyler, followed by a different residence in Tyler. She then moved into C.F., III's, step-mother's home in Marshall, followed by a different home in Marshall, followed by three different residences in Arkansas.

15

According to Corpier, the children are making new friends and seem relaxed. They enjoy their school and the activities in which they are currently involved.

The foster family caring for C.F., III, has a stable home, and they have bonded well with him. This family would like to adopt all three children. The foster parents have good parenting skills and are interested in ensuring that the children grow up to be happy and healthy. April Hays, a conservatorship supervisor with the Department, testified that, in her opinion, adoption of all three children together would be in their best interests.[18]

Based on this record, under the standards as set out above, we conclude that the evidence is sufficient to allow the trial court to determine that the children's best interests were served by the termination of Mother's parental rights. Therefore, Section 161.001(b)(2) of the Texas Family Code has been met. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

*(3)     Mother's Complaint Regarding Jury Charge Error Was Not Preserved for Review*

Mother contends that the broad-form jury question for each child that encompassed both the statutory grounds for termination and best interests of the children submitted to the jury allowed for a verdict of less than ten jurors. Consequently, Mother claims that her due process rights were violated. To preserve jury charge error for our review, the complaining party must advise the trial court of the complaint in a timely fashion and get a ruling. TEX. R. APP. P. 33.1(a)(1)(A); *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003); *see* TEX. R. CIV. P. 274. Here, Mother failed to object

---

[18]If the children are adopted, they would be eligible for college tuition waiver, and would further qualify for a full Pell grant to cover college room and board. The children would also be permitted to remain on Medicaid until they reach the age of twenty-one.

to the broad-form submissions of which she now complains.  Consequently, Mother has not preserved this issue for our review.[19]  *See* TEX. R. APP. P. 33.1(a)(1)(A).

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     November 13, 2017
Date Decided:       November 17, 2017

---

[19]Due process does not require the review of an unpreserved complaint of charge error in parental-rights termination cases.  *A.V.*, 113 S.W.3d at 358 (citing *In re B.L.D.*, 113 S.W.3d 340, 354–55 (Tex. 2003)); *In re D.G.*, No. 06-15-00025-CV, 2015 WL 6520251, at *12 (Tex. App.—Texarkana Oct. 28, 2015, pet. denied) (mem. op.).