

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00020-CV
_____


IN THE INTEREST OF T.K. AND G.K., CHILDREN


On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2021-857-CCL2


Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

The Department of Family and Protective Services filed a petition to terminate Father's parental rights to his six-year-old daughter, Tara.[1]  After a bench trial, the trial court found that statutory grounds supported termination of Father's parental rights because he (1) knowingly placed or allowed Tara to remain in conditions or surroundings that endangered her physical or emotional well-being, (2) engaged in conduct or knowingly placed Tara with persons who engaged in conduct that endangered her physical or emotional well-being, (3) constructively abandoned Tara, and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain Tara's return.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O).  The trial court terminated Father's parental rights to Tara after finding that doing so was in her best interests.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).[2]

On appeal, Father argues that the evidence is legally and factually insufficient to support the trial court's findings on both the statutory grounds for terminating parental rights and the best-interests finding.  Because we find that sufficient evidence supports the trial court's statutory ground E and best-interest findings, we affirm the trial court's judgment.

I.      **Standard of Review**

"The natural right existing between parents and their children is of constitutional dimensions."  *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting

---

[1]To protect the child's identity, we will refer to the child and her family members by pseudonyms.  *See* TEX. R. APP. P. 9.8.

[2]Mother retained her parental rights under the trial court's order.  Charles, the biological father of Tara's half-sibling, Grant, suffered termination of his parental rights to Grant but is not a party to this appeal.

2

*Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is therefore required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920

(Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 108). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "'[I]n making this determination,' we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'"" *Id.* (alteration in original) (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-

4

18-00012-CV, 2018 WL 3077784, at \*3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount.'"" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

## II.      Sufficient Evidence Supports the Trial Court's Statutory Ground E Finding

Father asserts that the evidence is legally and factually insufficient to support the trial court's findings under grounds D, E, N, and O. "Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)). "Even so, when the trial court[']s findings under grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under at least one of those grounds when they are challenged on appeal." *In re S.A.W.*, No. 06-21-00116-CV, 2022 WL 1193667, at \*3 (Tex. App.—Texarkana Apr. 22, 2022, pet. denied) (mem. op.) (citing *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the Family Code.")). "This is because termination of parental rights under these

grounds may implicate the parent's parental rights to other children." *Id.* (citing *In re N.G.*, 577 S.W.3d at 234; TEX. FAM. CODE ANN. § 161.001(b)(1)(M) ("providing as a ground for termination of parental rights that the parent 'had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)'").

## A. Statutory Ground E Requirements

Under ground E, parental rights may be terminated "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367).

A finding under ground E must be based on more than a single act or omission. "Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67.

"Ground E 'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *In re N.S.G.*, 235 S.W.3d at 366–67

(quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The endangering conduct may . . . occur 'either before or after the child's removal by the Department.'" *In re S.A.W.*, 2022 WL 1193667, at \*4 (quoting *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at \*11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.)).

### B.    Evidence at Trial

The evidence at trial showed that three-year-old Tara watched her two-year-old brother, Leo, drown in a hot tub at a Holiday Inn in Kilgore, Texas. Leo was airlifted to the Children's Hospital in Dallas but did not survive. Penny Cullefer, an investigator with Child Protective Services, testified that she received an intake for neglectful supervision of Tara, Leo, and their younger step-sibling, Grant, after the incident.

### 1.    The Drowning

Vance E. Callahan, Jr., a sergeant with the Kilgore Police Department, testified that he was first to arrive at the scene of the drowning. Callahan said that the pool area was the size of the courtroom and that Father was "trying to revive his son," who was "lifeless, blue in the face and lips." According to Callahan, Father said he was feeding Grant "and he turned his back" until Tara reported that Leo fell in the water and said she could not "get to him."

Cullefer visited the Holiday Inn and described the pool and hot tub area as "very small" and "on the bottom floor near around the corner from the front desk." The indoor pool area also had "a regular one bathroom with a door." Cullefer spoke to Father, who told her he was bottle-feeding Grant at "a table at the office end of the pool where the hot tub [was]" when Tara reported that Leo had fallen into the hot tub. "[B]ased on the [small] size of the area, and

7

[because] there was no one else in the pool," Cullefer believed that Father would have heard Leo falling in if he were near. As a result, Cullefer "believed the kids were probably unattended."

Mother's testimony supported Cullefer's theory. Mother testified that Father admitted he had walked away from the pool area and was in the bathroom feeding Grant. According to Mother, Father would not have been able to see Leo and Tara from the bathroom. Mother testified that Tara said "she tried to get [Leo] out. That she had been trying, he was too heavy." Father told Mother that he did not hear Leo falling in "because [Grant] was screaming," but based on the timing of text messages and phone calls from Father, Mother believed that Father was "most likely on his phone during the incident."

Mother testified that leaving toddlers in a pool area unsupervised was dangerous to their physical health. Mother said she had provided pool floaties, which Father should have put on the children as soon as they walked into the pool area. Mother said Father knowingly failed to put the floaties on and instead "sat them down [while] doing something with [Grant]." Latresse Russell, the Department's conservatorship worker, concluded that Father's neglectful supervision led to Leo's death.

### 2. Evidence of Drug and Criminal History

Callahan said that Father did not appear to be under the influence of any drugs at the time of the incident. Even so, based on Father's prior history with the Department and "admi[ssion] to using drugs in the past," Cullefer asked Father to take a drug test, but he refused. Mother testified that she caught Father "with a [methamphetamine] pipe," that Father admitted he had relapsed, and that Father "got a possession charge" "[i]n the months before the accident."

8

Father, who was incarcerated at the time of trial, was also arrested during the pendency of the case and had been jailed in Taylor, Gregg, and Midland Counties.

Mother also said there were physical conflicts between her and Father. According to Mother, after she attempted to create distance between them due to Father's drug use, Father "grabbed [her]" and "threw [her] around."

### 3. Missed Visitation with Tara

In between his confinement, Gilbert T. Brook testified that Father visited Tara in his home during the brief time she was placed there. According to Brook, Father's visit with the child was inappropriate because Father left the visit early after "grill[ing]" Tara about Mother. Brook said Father "just wanted to know what [Mother] was doing, who she was with, who she[] [was] talking to." Although Father and Tara had supervised, recorded visits, Brook said, "I had to get onto [Father] about asking [Tara] about [Mother] or grilling her about [Mother], until it got to the point where he blew up on me." As a result, Brook told Father he would need to go through the Department for additional visits.

Mother testified that Father failed to exercise his right to visit Tara, which made her "sad . . . because she missed him." After he refused drug testing, in September 2022, the trial court suspended Father's visits. According to Mother and Cheri Peek, the Court Appointed Special Advocate, Father had not seen Tara in two years. Russell said that missed visitation leads to challenges with the parent-child relationship, and Mother and Peek testified that Tara had not mentioned Father. Peek said, "I think it's going to be confusing if [Father] come[s] in and out of [Tara's] li[fe] and not of a stable environment."

9

### 4. Failure to Complete the Family Service Plan

Cullefer and Russell also said that Father was not cooperative with the Department's request to complete his family service plan. Russell testified that Father had refused to take all but two drug tests, including when "the judge ordered [Father] to go drug test" after Father appeared in court.[3] As a result, Father failed "at least fifteen" drug tests for failure to take them. Russell opined that, given Father's history, "there[] [was] clearly a drug issue that ha[d] not been addressed," which raised safety concerns for Tara. Russell testified that substance-abuse treatment was recommended after Father's assessment but that Father did not complete it.

Russell said Father was unable to demonstrate that he had a safe environment for a child because the Department could not "get a stable address," received a report that he had lost his job as a truck driver, and was notified "multiple times [that] he was arrested on old charges and new charges." Russell testified that Father did not complete individual counseling or parenting classes recommended after his psychological evaluation.

### 5. The Parties' Recommendations

Father testified that he provided financial support for Tara and believed it was in Tara's best interest to remain with him. Mother (1) denied receiving Father's money for Tara's support, (2) did not believe that Father had a willingness to change because he did not accept the Department's services, and (3) testified that termination of Father's parental rights was in Tara's best interests. Mother also testified that Tara was not safe around Father, that the drowning had endangered Tara's emotional wellbeing, and that Tara might need therapy for "the trauma of

---

[3]Russell said that Father's drug tests were negative on June 23 and July 21, 2021.

what happened that day because she remember[ed] everything."[4] As a result, Mother believed it was in Tara's best interests to remain with her.

Russell testified that Mother had "worked really hard and made a lot of sacrifices to make sure she got her kids back." Russell and Peek said that, since Tara and Grant's monitored return, Mother provided for them well and had a stable home. In contrast, Russell said that Father's choices, including his lack of contact with the Department, failure to drug test, and unwillingness to work his family service plan, indicated he was not "able to be responsible for children who [were] at an age who [could not] protect themselves." Accordingly, Russell and Peek testified that it was in Tara's best interests to remain with Mother and have Father's parental rights terminated.

After hearing this evidence, the trial court terminated Father's parental rights to Tara.

## C.      Analysis

Under ground "(E), it is sufficient that the child[ren]'s well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). Here, the drowning exposed Tara to the loss of her brother. The evidence at trial showed that Father told Cullefer that he was at a table near the hot tub at the time of Leo's drowning but that Cullefer did not believe Father's account. According to Mother, Father (1) failed to place pool floaties on Leo or Tara, (2) admitted that he had walked away from the pool area, (3) did not hear Leo fall into the hot tub, and (4) did not see Tara as she struggled to save her brother.

---

[4]Russell said that Tara clearly loved and missed Leo but did not exhibit signs of emotional trauma.

Russell testified, and the trial court was free to believe, that Father's neglectful supervision of the children led to Leo's death, which was witnessed by Tara.

The evidence also showed that Father had a drug history. "Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d at 848 (quoting *In re N.S.G.*, 235 S.W.3d at 368); *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (stating that parent's illegal drug use "is often cited as conduct [that] will support an affirmative finding" under ground E). Father's prior history with the Department involved an allegation of drug use. Mother testified that Father admitted he was on drugs a few months before the incident and that Father had been arrested for possessing drugs. Despite requests from Cullefer, Russell, and the trial court, Father failed to show up for at least fifteen drug tests. As a result, "[t]he trial court was free to infer that this refusal indicated that Father was continuing to use drugs." *In re K.A.M.C.*, No. 06-18-00109-CV, 2019 WL 1186709, at *4 (Tex. App.—Texarkana Mar. 14, 2019, no pet.) (mem. op.); *see In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.). Even though nothing showed that Father ever used drugs in front of Tara, "'[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under' Ground E." *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (quoting *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.)).

Here, the record shows that Father was jailed for criminal activity, including possessing drugs. Russell testified that the Department was notified "multiple times" that Father was arrested on "old charges and new charges." At trial, Father was incarcerated, and there was no evidence indicating when he might be released. Incarceration or "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment" under ground E. *In re N.S.G.*, 235 S.W.3d at 367 (quoting *Boyd*, 727 S.W.2d at 533).

Father's presumed positive drug tests and incarceration led to his inability to provide for Tara. The Department's witnesses testified that Father had lost his job and was unable to maintain any stable residence. When a parent fails, or is unable, to provide stable housing and provide for his child's support, the child is exposed to a life of uncertainty and instability. *In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *5 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem op.).

Also, Cullefer and Russell both testified that Father was unable to complete his family service plan. In addition to the refusal to drug test, Father did not complete substance-abuse treatment or recommended parenting classes and failed to fully exercise his visitation rights with Tara. Under statutory ground E, "a parent's failure to complete relevant requirements of [her] service plan" is a relevant consideration. *In re S.A.W.*, 2022 WL 1193667, at *4 (citing *In re Z.J.*, 2019 WL 6205252, at *11; *In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.)).

After reviewing all the evidence, we find it legally and factually sufficient to support the finding that Father voluntarily engaged in a course of conduct that endangered Tara's physical or

13

emotional well-being. Because the trial court's ground E finding was supported by sufficient evidence, we overrule Father's point of error.

## III. Sufficient Evidence Supports the Trial Court's Best-Interest Finding

Father also challenges the factual and legal sufficiency of the evidence supporting the trial court's finding that termination of his parental rights was in Tara's best interests.

### A. Standard of Review

In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re N.L.D.*, 412 S.W.3d 810, 818–19 (Tex. App.—Texarkana 2013, no pet.) (citing *Holley*, 544 S.W.2d at 371–72); *see In re E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b). These factors are not exhaustive, and there is no requirement that all of them be proved to terminate parental rights. *In re C.H.*, 89 S.W.3d at 27. "In certain cases, evidence relating to one factor may be adequate to support a finding that termination is in the best interest of the child." *In re J.R.H.*, No. 06-18-00052-CV, 2018 WL 6625886, at *6 (Tex. App.—Texarkana Dec. 19, 2018, pet. denied) (mem. op.) (citing *In re B.H.R.*, 535 S.W.3d 114, 123 (Tex. App.—Texarkana 2017, no pet.)). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28.

14

**B.    Analysis**

As for the first *Holley* factor, there was no evidence of Tara's desires.  Even so, Peek and Mother both testified that Tara did not mention Father.  Although Tara was "sad" because Father had not visited her, she had not seen Father in the two years preceding trial.  Conversely, Peek said, "[Tara] is very attached to her mother; always in her lap, loving on her, kissing on her, telling her that she loves her."  Because the evidence shows that Tara was bonded to her Mother, who provided for her needs, and Tara had not recently seen or mentioned Father, we find that the first *Holley* factor weighs in favor of termination.

The second *Holley* factor considers a child's emotional and physical needs, but "[a] parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs."  *In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)).  The record shows that Tara's physical and emotional needs were great given her young age and Mother's testimony that she might require therapy for the trauma suffered by watching her brother drown.  Yet, Father was incarcerated in Taylor, Midland, and Gregg Counties on old and new criminal charges while the case was pending, which demonstrated his instability and inability to care for Tara.  Russell said that the Department was unable to obtain a "stable address" for Father, who had lost his job and was incarcerated at the time of trial.  Without stability, income, or a home, nothing indicated that Father could provide for Tara's future emotional and physical needs.  As a result, we conclude that the second *Holley* factor weighs in favor of terminating Father's parental rights.

15

As for the third *Holley* factor, the trial court was free to infer that Father's past conduct, including his drug use, physical violence toward Mother, and negligent supervision leading to Leo's death, showed he was a danger to Tara's emotional or physical well-being. *See In re A.B.*, No. 06-22-00020-CV, 2022 WL 3567911, at *7 (Tex. App.—Texarkana Aug. 19, 2022, pet. denied) (mem. op.); *In re Z.M.*, 456 S.W.3d at 689; *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.); *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ).

In considering the fourth and fifth *Holley* factors, the Department offered Father services that he did not take advantage of, which showed that he lacked appropriate parental abilities. Russell said that Father's unwillingness to work his family service plan indicated he was not "able to be responsible for children who [were] at an age who [could not] protect themselves," and we agree. Father did not complete individual counseling. Although he finished one parenting class, a subsequent psychological evaluation noted "inconsistent and defensive responses" that resulted in a recommendation for further parenting classes, which Father failed to finish. Even though Father had a drug history, he failed to comply with requests from the Department and trial court to undergo drug testing. He also failed to regularly visit Tara, despite having an opportunity to do so, and showed he lacked parental ability when he used visitation time to enquire about Mother's activities instead of bonding with and engaging Tara. As a result, we find that the fourth and fifth *Holley* factors weigh in favor of terminating Father's parental rights to Tara. *See In re B.L.H.*, 609 S.W.3d 271, 281 (Tex. App.—Texarkana 2020, pet. denied)

(parent's "failure to complete the family service plan, use of drugs during the pendency of the case, and absence from several visitation opportunities demonstrated a lack of parental abilities and showed that [his] relationship with [his child] was not proper"); *see also In re D.W.*, 533 S.W.3d 460, 471 (Tex. App.—Texarkana 2017, pet. denied); *In re X.R.L.*, 461 S.W.3d 633, 641 (Tex. App.—Texarkana 2015, no pet.).

The sixth and seventh *Holley* factors also weigh against Father. The testimony showed that Father had no stable home, used drugs, and had no plan for Tara since he was incarcerated for an unspecified amount of time. In contrast, the Department's plan was for Tara to remain with Mother, who had successfully demonstrated improved parenting skills, consistently tested negative for drug use, and proffered aspirations of future stability for her children. Because Father had no real plan for Tara's future and failed to achieve stability—in contrast to Mother's strong ability and desire to continue providing adequate care for Tara—factors six and seven weigh in favor of termination.

As for the eighth *Holley* factor, Father's drug use, criminal activity, failure to take advantage of visitation opportunities with Tara, and non-compliance with Department-mandated services shows that his relationship with the child was not appropriate. *See In re X.R.L.*, 461 S.W.3d 633, 641 (Tex. App.—Texarkana 2015, no pet.); *In re H.C.*, No. 06-23-00016-CV, 2023 WL 3612368, at *6 (Tex. App—Texarkana May 24, 2023, no pet. h.) (mem. op.); *In re B.L.H.*, 609 S.W.3d at 281.

Last, Father points to his incarceration and the fact that visits were suspended after September 2022 as excuses for his acts and omissions. Even so, the record shows that Father

17

failed to visit Tara when he was out of jail and continued to engage in criminal activity leading to his arrest for "new charges." Father also offers no excuses for his failure to submit to court-ordered drug testing that was requested after he appeared in Court. As a result, we find that the last *Holley* factor weighs in favor of terminating Father's parental rights.

After reviewing the *Holley* factors and considering the entirety of the record before us, we find that the clear and convincing evidence presented at trial is legally and factually sufficient to support the trial court's best-interest finding. As a result, we overrule Father's last point of error and affirm the judgment terminating his parental rights.

## IV. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted: July 10, 2023
Date Decided: July 14, 2023

18