

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00084-CV

IN THE INTEREST OF M.W., A CHILD

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2023-100

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

The Department of Family and Protective Services filed a petition to terminate Father's parental rights to his son, Marshall.[1]  Following a bench trial, the trial court terminated Father's parental rights[2] after finding that (1) he knowingly placed or allowed Marshall to remain in conditions or surroundings that endangered his physical or emotional well-being, (2) he failed to comply with the provisions of a court order that specifically established the actions necessary to obtain Marshall's return, as described in Section 161.001(b)(1)(O) of the Texas Family Code, and (3) termination of his parental rights was in the child's best interests.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (O), (b)(2) (Supp.).

On appeal, Father argues that (1) the trial court erred by failing to remove the attorney ad litem for Marshall after discovering that she had represented Father in a case where his parental rights to another child were terminated, (2) his counsel rendered ineffective assistance by failing to object to the continued appointment of the attorney ad litem, and (3) the evidence is insufficient to support the trial court's finding that termination of Father's parental rights was in Marshall's best interests.  We find that Father failed to preserve his first point of error for our review and cannot show from the silent record before us that his counsel rendered ineffective assistance.  We also conclude that the trial court's best-interest finding was supported by legally and factually sufficient evidence.  As a result, we affirm the trial court's judgment.

---

[1]We use pseudonyms to protect the identities of the child.  *See* TEX. R. APP. P. 9.8.

[2]Mother voluntarily relinquished her parental rights and does not appeal.

## I. Father Failed to Preserve Any Complaint About the Attorney Ad Litem

Father's first point of error complains of the trial court's appointment of April Prince as the child's attorney ad litem. Father argues that Prince should have been disqualified because she represented him in a prior proceeding resulting in the termination of his parental rights to another child.

Under Rule 33.1(a) of the Texas Rules of Appellate Procedure, to preserve this complaint for appellate review, Father was required to bring it to the trial court's attention in a timely manner and obtain a ruling on that complaint. *See* TEX. R. APP. P. 33.1(a). Accordingly, "[a] party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint." *Vaughan v. Walther*, 875 S.W.2d 690, 690 (Tex. 1994) (per curiam) (orig. proceeding); *see Buck v. Palmer*, 381 S.W.3d 525, 528 (Tex. 2012) (per curiam) (finding argument relating to attorney disqualification waived after untimely seven-month delay in seeking the disqualification).

Our record shows that, although Father was aware of Prince's appointment on April 21, 2023, he never complained of the appointment and did not seek to disqualify her. In fact, the trial court was only made aware that Prince had represented Father in a prior proceeding at the September 24, 2024, trial. Even then, Father did not allege any conflict of interest and did not move to disqualify Prince as Marshall's attorney ad litem. As a result, we conclude that Father failed to preserve this complaint for our review. *See* TEX. R. APP. P. 33.1(a).

3

**II.     Father Cannot Show that His Counsel Rendered Ineffective Assistance**

In his second point of error, Father argues that his counsel was ineffective because his counsel failed to object to Prince's ad litem appointment or request her disqualification.[3]  Father contends that he "shared confidences with" Prince "and expected a measure of privacy and privilege," under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct, but that Prince's appointment as attorney ad litem for Marshall essentially deprived him of a fair trial. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT 1.05.  Father also argues that Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct prevents a lawyer from representing opposing parties in "a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer."  TEX. DISCIPLINARY RULES PROF'L CONDUCT 1.06(b)(1).

"'[A]ll parents appearing in opposition to state-initiated parental-rights termination suits' are entitled to 'the right to *effective* counsel . . . .'"  *In re J.J.*, 647 S.W.3d 524, 529 (Tex. App.—Texarkana 2022, no pet.) (alteration in original) (quoting *In re D.T.*, 625 S.W.3d 62, 71 (Tex. 2021)).  "Ineffective-assistance-of-counsel claims in parental-[rights] termination cases, as in criminal cases, are governed by the United States Supreme Court's two-prong test articulated in *Strickland v. Washington*[, 466 U.S. 668, 687 (1984)]."  *Id.* (first alteration in original) (quoting *In re D.T.*, 625 S.W.3d at 73).

"First, the [appellant] must show that counsel's performance was deficient[,] [which] . . . requires showing that counsel made errors so serious that counsel was not functioning as the

---

[3]"Typically, courts look to the ethical rules promulgated by the State Bar to evaluate conflicts of interest in civil cases." *In re B.L.D.*, 113 S.W.3d 340, 346 (Tex. 2003).

'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (alterations in original) (quoting *In re D.T.*, 625 S.W.3d at 73). "Second, the [appellant] must show that the deficient performance prejudiced the defense[,] [which] . . . requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (alterations in original) (quoting *In re D.T.*, 625 S.W.3d at 73). "A party claiming ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to succeed." *Id.* (quoting *In re D.T.*, 625 S.W.3d at 73).

As for the first prong, "[a]llegations of ineffectiveness 'must "be firmly founded in the record.""" *Id.* at 530 (quoting *Lampkin v. State*, 470 S.W.3d 876, 897 (Tex. App.—Texarkana 2015, pet. ref'd)). Because "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective," "[t]he standard of review is much more deferential to trial counsel's actions when the claim is asserted for the first time on direct appeal [since] '[t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record.'" *Id.* (third alteration in original) (quoting *Lampkin*, 470 S.W.3d at 898 n.10). "When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record 'is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance.'" *Id.* (quoting *Lampkin*, 470 S.W.3d at 898).

"Counsel's performance falls below acceptable levels only when the 'representation is so grossly deficient as to render proceedings fundamentally unfair.'" *Id.* (quoting *In re D.T.*, 625 S.W.3d at 74). "We give great deference to counsel's choices and indulge "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance," including the possibility that counsel's actions are strategic.'" *Id.* (quoting *In re D.T.*, 625 S.W.3d at 74). Because the record "is silent on counsel's reasoning or strategy," "[w]e will not speculate to find trial counsel ineffective." *In re K.L.L.H.*, No. 06-09-00067-CV, 2010 WL 87043, at *6 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.). Instead, we assume counsel's actions were "due to any strategic motivation that can be imagined." *Id.*

Here, the reporter's record contains a plausible explanation as to why counsel may have decided to forego any objection to Prince's continued appointment. The record shows that Father had never seen the prior order terminating his parental rights to another child, did not recall being served any paperwork related to the prior case, did not recall ever meeting Prince, and did not know that Prince had been appointed to represent him before. As a result, it is possible that counsel did not object to Prince's appointment or seek disqualification because Father had not shared any confidences or privileged information with Prince. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT 1.05 (involving confidentiality of information). Also, because Marshall was not born until well after Prince's representation in the prior case had ended, counsel could have believed that the prior termination proceeding was not a substantially related matter or that Father's interests would not be materially affected by Prince's representation of Marshall. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT 1.06(b).

Based on the silent record before us, we find that Father cannot meet the first *Strickland* prong. Accordingly, we overrule Father's second point of error.

6

## III. Sufficient Evidence Supports the Trial Court's Best-Interest Finding

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.— Texarkana 2018, no pet.) (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). Father does not challenge the trial court's findings on grounds D or O. Instead, in his last point of error on appeal, Father argues that the evidence is insufficient to establish the trial court's finding that termination of his parental rights was in Marshall's best interests.

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *Id.* (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof— clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

7

"This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied)).

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 108); *see In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed

8

evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.* (alteration in original) (quoting *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109). When, as in this case, "neither party requests findings of fact and conclusions of law following a nonjury trial, all fact[-]findings necessary to support the trial court's judgment are implied." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017).

### B.    The Evidence at Trial

Marshall was seventeen months old at the time of trial. Shaena Osteen, the Department's caseworker, testified that Marshall came into the Department's care shortly after birth after it received allegations that his parents were squatting inside of a home without working utilities because they had been evicted from their residence. Father testified that the utilities to Mother's rental home were cut off during Mother's hospital stay, and Father claimed he was unaware of that until Mother and Marshall returned home from the hospital.

9

Osteen testified that the Department also received an allegation that Mother and Father were using drugs. Osteen visited Mother and the baby in the hospital, and they both tested negative for drugs, but Father tested positive for methamphetamine and marihuana during the pendency of the case. Father admitted that he had used methamphetamine when he was around Mother. He added that, before meeting Mother, he only "did marihuana," but he claimed that was not a drug. He then stated, "Well, I guess it is." Marshall's parents agreed to Marshall's removal by the Department at an adversary hearing, and the baby was placed with his maternal aunt and uncle while the Department investigated the allegations.

Osteen testified that she discussed Father's family service plan with him on several occasions and affirmed that Father understood that he was required to submit to random drug tests, obtain a stable home, and complete a drug and alcohol assessment, individual counseling, and parenting classes. Osteen said that Father did not submit to the eight random drug tests she had requested from September 26, 2023, until December 22, 2023. According to Osteen, Father said he did not appear for some of the tests because "he had more important things to do." In his defense, Father testified that he went to four drug tests requested by the Department but said that the results of one test was "tainted" because it was "diluted," which resulted in a failed test.

According to Osteen, Father attended six of his weekly visits with Marshall on time, appeared late for fifteen visits, and failed to attend seven visits. In January 2024, the trial court suspended the visits and instructed the parents to attend a hearing in order for the visits to resume. Father testified that Marshall would become excited upon seeing him and loved visiting with him. Even so, Father did not attend the hearing, and as a result, his visitation with Marshall

10

was suspended. Osteen testified that she requested two more visits after the trial court's order, and was successful in setting up the visitation, but said that Father did not attend.

According to Osteen, Father had been arrested several times during the pendency of the case. She testified that he was jailed on November 27, 2023, January 12, 2024, February 7, 2024, and May 12, 2024. Father had not been released since the May 12 incarceration, was in a Substance Abuse Felony Punishment Facility (SAFPF) for drug rehabilitation, and was issued a bench warrant for trial. Father said that he was sentenced to six years' imprisonment for impeding breath during a family violence assault, that his sentence had been suspended in favor of community supervision, but that the State had filed a motion to revoke it after he failed drug tests on December 12, 2022, January 17, 2024, and January 26, 2024. Father admitted to smoking methamphetamine with Mother after Marshall's removal and skipping drug testing requested by his community supervision officer. As a result, Father agreed to resolve the State's motion to revoke his community supervision by agreeing to go to a SAFPF to "help [him]. . . be completely clean with the drugs."

Even so, Osteen testified that Father never completed the drug and alcohol assessment despite being scheduled to do so on five different occasions. After citing a transportation issue, the Department sent caseworker Ruben Benavidez to pick Father up, but he refused to go to the assessment. Osteen testified that Father also failed to attend his appointment for individual counseling and never began parenting classes. Osteen said that Father had been given rides from the Department before but never personally asked her for assistance with transportation. According to Osteen, Father could have completed his individual counseling online. Osteen

11

testified that, after December 2023, she had no more communication with Father even though he was required to remain in weekly contact with her as a part of his family service plan.

According to Father, he was taking parenting classes in SAFPF and only had one week to go before obtaining his certificate of completion. Father also said that he had "counselors in there" and indicated that he had undergone counseling and a psychological evaluation. Father admitted that he understood the family service plan but did not complete it.

Osteen testified that, after his release from SAFPF, Father would have to live in a "halfway house," and she had no indication that he would be able to provide Marshall with a safe home. Father said he was unemployed during Mother's pregnancy but found work after Marshall was born. Father, who was twenty-three at Marshall's birth, said he had a son when he was sixteen and a daughter when he was nineteen. According to Father, his parental rights to those children had not been terminated, and he visited with them, though they did not live with him.

Father testified that he loved and wanted Marshall and would be released to a halfway house in approximately four or five months. Father said that his uncle would get him a job "sandblasting or something like that" at Halliburton and testified that he wished to provide for Marshall.

Osteen testified that Marshall had been placed with his maternal aunt and uncle since right after his birth, that one of his siblings was also placed there and had been adopted by Aunt and Uncle, and that Marshall was "doing great" in that stable environment. Osteen testified that Marshall was healthy, that the home of Aunt and Uncle was appropriate, and that Aunt and

12

Uncle wished to adopt Marshall. According to Osteen, termination of Father's parental rights was in the child's best interests.

Jessica DeJohn, the Court Appointed Special Advocate, testified that the home of Aunt and Uncle was stable and safe and that they loved and cared for Marshall. DeJohn testified that Aunt and Uncle planned to adopt Marshall, who referred to Aunt and Uncle as his "[m]om and dad," and that it was in the child's best interests that Father's parental rights be terminated so Marshall could remain with them. According to DeJohn, Father had not contacted Aunt or Uncle to discuss Marshall.

After hearing that evidence, the trial court determined that statutory grounds D and O supported terminating Father's parental rights and that doing so was in Marshall's best interests.

### C. Analysis

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount.'"" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.— Texarkana 2015, no pet.)).

"In determining the best interests of the child," courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re N.L.D.*, 412 S.W.3d 810, 818–19 (Tex. App.—Texarkana 2013, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b).

The Department is not required to present proof of each *Holley* factor. *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

As for the first factor, Marshall was seventeen months old at trial and was too young to speak his desires. Even so, the record showed that Marshall had lived with his aunt and uncle since shortly after his birth, called them "[m]om and dad," and was loved in their home. Also, because Father's visitation was suspended, he had not seen Marshall for almost nine months. As a result, the first *Holley* factor weighs in favor of terminating Father's parental rights to his child. *In re K.O.*, 488 S.W.3d 829, 842 (Tex. App.—Texarkana 2016, pet. denied).

Next, Marshall's emotional and physical needs now and in the future were great given his young age. Yet, the evidence at trial showed that Father was not employed, had no stable home

14

of his own, and could not provide for the child since he was in SAFPF. After Marshall was removed, Father used methamphetamine and marihuana instead of determining how to provide for Marshall's needs to obtain his return. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at \*17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)). We find that the second and third *Holley* factors favor terminating Father's parental rights.

As to the fourth *Holley* factor, the evidence demonstrated that Father had not completed parenting classes, had missed several visitations with Marshall, and failed to appear for a hearing required to reinstate his visitation with the child. The trial court was also made aware that Father had two other children who did not live with him. From this evidence, as well as the evidence of Father's drug use, the trial court could determine that Father lacked parental abilities necessary to provide the appropriate care for Marshall.

Next, the trial court could have determined that there were programs available to assist Father that he did not take advantage of. Osteen testified that Father failed to complete his family service plan, which was required to obtain Marshall's return. Father declined to take advantage of individual counseling or the Department's efforts in eliminating his drug use. Even though Father remained incarcerated since May 2024 and had several services available to him in SAFPF, including parenting classes, he had not yet completed them. Moreover, he failed to remain in weekly contact with Osteen, who could have assisted him throughout the case, but he chose instead to miss random drug testing because he "had more important things to do." From

15

that evidence, the trial court was free to determine that the fifth *Holley* factor weighed against Father.

Regarding the sixth and seventh factors, Father admitted that he would remain incarcerated for several months and would be required to complete a successful transition into a halfway house. That showed that Father had no stable home. As a result, his plan for Marshall did not involve the child remaining with him. As noted by the Department's witnesses, Father's plan would go against the need to provide Marshall with stability. In line with that need, the Department planned on allowing Marshall to remain with Aunt and Uncle, who had a stable home and planned to adopt Marshall, just as they had adopted his sibling. We find that the sixth and seventh *Holley* factors weigh against Father.

As for the remaining two factors, Father's failure to complete a drug and alcohol assessment, failure to attend random drug testing requested by Osteen, and positive drug tests during the pendency of the case showed that the existing parent-child relationship was not an appropriate one. Father also missed several visits with Marshall, was late to several visits, and failed to appear for a court hearing that was required to reinstate his visitation. While Father cited lack of transportation as an excuse, the record showed that Father did not take advantage of transportation provided by the Department, and there was no excuse for his arrests or positive drug tests during the pendency of the case.

Considering the *Holley* factors, and in light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Father's parental rights was in Marshall's best interests. Therefore, we conclude that the evidence was legally and

16

factually sufficient to support the best-interest finding, and we overrule Father's last point of error.

**IV.     Conclusion**

We affirm the trial court's judgment.


Scott E. Stevens
Chief Justice

Date Submitted:        February 11, 2025
Date Decided:          February 28, 2025

17